We will hear from Mr. Villarreal. Thank you, Your Honors. May it please the Court. My name is Miguel Villarreal with the law firm of Gunley & Cave, P.C. I represent Casa Tradicion S.A. de C.V., the appellant and plaintiff in this case, and I reserve five minutes for rebuttal. The issue in this case is whether the District Court's ruling of no likelihood of confusion between Casa Azul for tequila products and Casa Azul for tequila products must be vacated. It must. The standard of review to be applied here is de novo review because the District Court's ruling rested on at least five erroneous legal views of the law that infected its ultimate ruling and its subsidiary fact findings. This requires de novo review as indicated by Elvis and Roto-Rooter. This Court tells us that there are several factors called the digits of confusion that are considered in determining whether there is a likelihood of confusion between two marks. The erroneous views of the law which infected the District Court's factual findings in this case are several, and I will go through some examples. For the first factor, strength of the mark, this Court has recognized that the strength of the mark is a vital consideration in the likelihood of confusion analysis. Here the District Court did not determine the extent of defendant's third-party use evidence. The District Court found that Plaintiff's Casa Azul mark was weak based in part on third-party uses of brands, but this Court requires evidence of the extent of the use of those third-party brands before they may be used as a basis to find a mark as weak. Streamline tells us as much. Smack Apparel asks the question, does the third-party use diminish in the public's mind the association of the mark with Plaintiff? Well, here there was no evidence, virtually none, of the extent of the use of third-party brands. There was virtually no evidence as to the customer awareness of this third-party use, and there was no evidence of the public's association with Plaintiff that had been diminished by such third-party use. The District Court's reliance on these third-party uses to diminish the strength of Plaintiff's Casa Azul mark without evidence of the extent of such use was legal error. The second legal error under this first factor, strength, is that the District Court relied on these third-parties where they included either Casa or Azul but not Casa or Azul combined. This is an incorrect legal standard, and it's not supported by the evidence. Elvis tells us that concerning the strength of the mark, the focus must be on the senior user's mark. There's no evidence of any others using the term classe. Also, this Court provides that third-party usage must mirror the basis of Plaintiff's claim for infringement right out of future proof. Can you stop for just a second? Yes, Your Honor. What is your position on the District Court's analysis of the word you were just talking about, Azul or Casa, without using both of the words together? You believe that they must be analyzed in the context of both words together. Is that correct? And that's what you believe was an error by the District Court? That is correct. Because many tequila brands use the word Azul. That is correct, Your Honor. So you can't say, well, because everybody uses Azul, and that's ubiquitous, it doesn't mean that this mark is ubiquitous. Is that what your position is? So our position is, yes. We don't contend that the use of the mark Azul in and of itself for a tequila product is an issue for us. Nor do we contend that the term Casa in and of itself is an issue for us. We've never had any, and we being plaintiffs, have never had any issues with either Casa or Azul. It is the combined term, and that is the basis of Plaintiff's claim that they sued a defendant for. It's that combined term that is of issue in this case. What about, did the District Court consider and reject the many references to Casa Azul in pop culture in analyzing this? So the- I'm talking about all the song lyrics, you know, from Kanye and Peso Puma and Ozuna. Everybody has this Casa Azul in their music references. And so does that, did the District Court consider that, and is that pertinent here? Well, it is very pertinent, and we don't believe that the District Court considered that in the analysis. That actually goes to the strong marketplace recognition, Your Honor. And in addition to that, there was much evidence concerning this strong place recognition. Casa Azul has been sold in the United States for over 20 years. The use is pervasive. It's sold in 85 countries around the world. 54,000 accounts around the U.S., that's at 8664. In 2022 alone, 1.8 million bottles of Casa Azul were sold. It is a massively popular brand, and it is so popular it's become a popular culture icon. Like Your Honor had just noted, several recording artists do include that in their songs, notably Kanye West and J. Cole. I refer the Court to Plaintiff's Exhibit 150, which is the J. Cole video, placeholder for that is 13757. What did the District Court say about all that? The District Court glossed over it. The District Court did not take into consideration the use of Casa Azul in these songs. These songs are heard, not seen. When consumers hear these songs, they hear the words Casa Azul, Casa Azul over and over again, and the District Court did not take that into consideration. Was there evidence as to how deeply that those references of popular culture were spread? Any expert testimony regarding that? We did not have expert testimony, Judge Guidry, but what we did have were, if you look at the exhibit that I pointed to, there's a download from Spotify for this particular song, and at the time of the evidence at trial, I believe it had over half a million views, which suggests that there is a pervasive reach in the audience of those who listened to that video. But no evidence as to whether the reference to the product was understood by the listeners or was more than just lyrics to a song? Well, no. There is reference in the song based on those lyrics, and the video then also would go to support that there is a strong association with the plaintiff's product, because the video does show the product pervasively throughout the video as well, both the product as well as the product named Classe Azul. You started out by telling us that the standard of review here is de novo, because you're talking about the legal standard, but what would you say to the argument that, well, really, this is all very . . . there's a lot going on here, and the District Court tried the matter, very learned District Court tried the matter, and it's really supposed to be reviewed now at this point for clear error, and you can't find a clear error here. What would you say in response to that? I would say that in this case, that's incorrect. Elvis Presley tells us as much. In Elvis, there was a single legal error, and that was the misuse of parody in the likelihood of confusion analysis. In this case, we certainly have more than just a single legal error. I've given just a couple of examples, but we've cited several others in our briefs. Okay. So, it's the fact that the legal error is more intertwined and affects the decisions on the factual points? To be more specific, it's that the legal error infected the ultimate conclusion that the District Court reached concerning likelihood of confusion, and let's just take the factor of strength as one example. Strengths of the marks, strong marks get very broad scopes of protection in the trademark world. In contrast, a weak mark gets a very narrow scope of protection. Because the District Court got this wrong, we believe in our assessment, that skews the entire legal analysis for the likelihood of confusion all the way throughout, because we see as a theme, the stronger marks, the closer the products are together, those tend to go towards the likelihood of confusion. But if you have a weak mark, all of a sudden, you can base the rest of those analyses based on, well, this is a weak mark, so this one doesn't go towards likelihood of confusion. That's just on the standard of the strength. For actual confusion, that's even worse, because you don't have to show any evidence of actual confusion to find a likelihood of confusion, but here, we don't have just a single evidence of likelihood of confusion. We have several, and the Court only considered a certain amount and said that there was no likelihood of confusion, but it didn't consider many, many others. Did the District Court not believe Southern Glazer's Wine and Spirits representative, for example, that denoted the confusion in the market? I guess that's a friendly question, in that there's some evidence in the record, and then the District Court seems to say there's not evidence in the record. So, that's what's confusing to me. Yeah. Well, it was confusing to us as well, Your Honor, because, like I said, there were several instances, and I can go through . . . Did the District Court say that they didn't believe? Was there something preposterous about the person's presentation, or . . . No. What the District Court did was it categorized all of the evidence of the plaintiff's actual confusion into three categories, and then said, based on these categories, we don't see that the plaintiff actually showed any evidence of actual confusion, and we're scratching our heads because, well, wait a minute, the District Court didn't consider all of this other evidence. For instance, any actual evidence that was actually experienced by the defendant themselves, you're not finding that in the categories that the District Court considered. There is a marketing manager for a defendant who experienced at least three incidences where consumers mistakenly thought that he worked for Klossy O'Sull. They also asked him if the tequila soda that they were marketing at that time was made with plaintiff's Klossy O'Sull tequila. That's at 8927 through 30. There were three defendant's employees who had to correct third parties who mistakenly thought that defendant's product was Klossy O'Sull. That's at 6913. These were not considered by the District Court. There are two marketing agencies, Your Honor, that were hired by the defendant to perform in-store testing that reported to the defendant that consumers were confusing Klossy O'Sull and Klossy O'Sull. This is at 12934, 12922, 6932 through 35, and 7016. These are found nowhere in the opinion. They are not included in the categories that the District Court considered as evidence of actual confusion. Had she considered these, the Court would have found that there was evidence of actual confusion favoring that factor. Can you help us with the timeline of when the defendant's tequila entered the market? Maybe I should ask the other side this. Sure. Because it seems that your argument may even be stronger on the tequila than on the tequila soda, perhaps. Yeah. Well . . . But the Court didn't allow the further confusion to seem to be a factor. you bound on the tequila product going forward, or is that saved for another day, or where is that? No. So the tequila product is also included in here, and we are not bound by that. And the District Court did, just as, by fiat, said that the tequila sodas and the bottled, plated bottles were different, cited the preliminary injunction ruling, and then moved on to the bottled tequila. So you are . . . So that finding is dispositive on the tequila as well? It is . . . The defendant's tequila is wrapped up in this? Yes. Both . . . Even though they weren't able to pursue the evidence on it? That's correct. So that's where we were hamstrung on this somewhat, Your Honor, because plaintiffs did request a survey of when that bottle came out. The bottle came out after all of the expert witnesses had already did their survey. We requested a survey to be done on this tequila. For the timeline that Your Honor had asked earlier, that tequila was introduced at the end of March 2023, early April 2023. This was well after the case had already started. By the time that the suit was filed, which was September 1st, 2022, the defendant had already had the tequila soda out in the market. We were able to do a survey to compare the tequila sodas versus Plaintiff's Class A Sealed Tequila. We were not able to do a survey comparing both tequilas because of the fact that the survey that we were conducting needed to replicate marketplace conditions, and we could not do that if there was a product that was not in the market at that time. You've saved time for rebuttal, sir. Oh, I see my time has almost stopped, so yes, I did. Any other questions? If you have something else, or maybe Judge Englehardt has a question. No, I was going to say, counsel, before you leave the podium, would you turn that light upward a little bit? I think one of the lawyers yesterday hit it, and the light is shining back. Now I can see your face a lot better. Now I can see my notes a lot better. Thank you. I think that's the way it's supposed to be. Thank you, Your Honor. Thank you.  Good morning, and may it please the Court. I'm David Bernstein, and I represent the Defendant DiPelle here, Casa Azul Spirits. Mr. Villareal noted that he believes the district court got it wrong in her assessment. Of course, every appellant believes the district court made errors below. But Judge Rosenthal heard five days of trial. She heard from six fact witnesses live. She heard from four experts live. She accepted into evidence 190 exhibits, 3,000 pages of documents. She also took on deposition testimony from five additional witnesses, and she considered 30 bottles of various tequilas, all of which had been purchased in Houston in the days before at the trial. I don't think anyone's saying that the district court didn't do the work, and I don't think this is a case . . . she's not on trial here. Yes, I appreciate that. I'm trying to decide whether or not there were legal errors that infected the proceedings. And I think that's the right question for this Court. Were there legal errors? Because I don't agree with the appellant that the standard on review here is de novo. The standard is the well-known appellate standard. Were there clearly erroneous findings of fact? Well, but if there are legal errors, then we have to review the legal errors based upon de novo review. And then if they infect the factual determinations, then we might send it back like we have done in a number of other cases dealing with marks and things. Of course, Your Honor. But on the key points, and I hope to touch on a number of them in the twenty minutes I have this morning, the judge did not make errors of law. And although one might quibble with whether her fact findings were correct or not, the reason I highlight how much evidence she received, how many witnesses she heard from, is that she was in the best place, the best position to judge that and to make factual . . . And the question is, are those factual findings plausible? If they are, the factual findings should not be reversed under the clearly erroneous standard. So let me jump into some of the points that the court was just asking about. I want to start, though, with three quick points. The first is that Judge Rosenthal acknowledged the oral similarity between classe azul and casa azul. But she also said that when you look at all of the other differences, that oral similarity doesn't itself compel a finding of a likelihood of confusion. The marks are different. They mean different things. The products are very different. Theirs is a very high-end luxury sipping tequila. It includes additives like artificial sweeteners to make it taste more sweet, to cover up the flavor of the agave spirit. Vanilla. It includes glycerin to change the way it feels in your mouth. Our client makes a very different product. It's an additive-free, organic, single-estate tequila. And the tequila soda is all-natural. And these products appeal to different consumers. And the price points are very different. Their products cost two to five times more for comparable products. And some of their products are thousands of dollars a bottle. And I know the classe azul products. They're ubiquitous in the market. You see their very distinctive decanters in bars and restaurants and in liquor stores around the country. But they're sold in different parts of those stores. And that's a point that Judge Rosenthal emphasized. In part because of their luxury positioning and their very high price, their products are typically displayed in a locked cabinet or behind the register where they're out of reach. Our client's products are on the shelves with similar products. The tequila sodas with things like high noon and white claw and the tequila spirit with similarly priced tequilas or even in the organic or additive-free section. All of these differences matter when we consider the likelihood of confusion. And the marketing is very different as well. And the fact that these tequilas exist in a crowded field in a sea of tequilas that include Casa and Azul in their name helps mean that consumers know that they have to exert care when they choose their tequila. Because they know there are other tequilas. Some of them, for example, all of which there is evidence in the record that they're all sold. One is called Cazul. So instead of Casa Azul or Casa Azul, it's Cazul. They've coexisted with it for a year. On the stand, their founder admitted he has no problem coexisting with Cazul. There's Campo Azul. There's Casa del Sol. There's even another tequila called Casa Azul. C-A-S-A-Z-U-L without a space. They've coexisted with these tequilas. And what that means, it goes to two things. It goes to the strength of the mark. Because this mark is made of very descriptive terms that are commonly used throughout the tequila market. Well, that might be where the legal error is. The first legal error that's been alleged. Whether it's a descriptive mark or a suggestive mark. Because to do Casa Azul, you have to be able to use your imagination. That it means that it's a blue class, it's high class, it's high end. Like Pizzeria Uno is number one pizza. The idea is that you have to be able to... And those are suggestive marks rather than descriptive marks. If you have to, like the Brizzy and the Fizzy that we had the case on. And the Extreme Lashes case. Can you address this? Yes. Why it's not suggestive and that it's descriptive? Because this is very important, whether this was put in the right box and analyzed under the right methodology. So a few points on that, Your Honor. First of all, whether the mark is descriptive or suggestive is a question of fact. And the district court heard a lot of evidence about that. I think the Future Brands case, the Izzy case, is actually very instructive. And I would ask the court to take a hard look at that case when you go back and discuss our arguments this morning. Because there the court said that the third party use is relevant even just for the portion of the mark that is similar. There it was Izzy, Brizzy and Vizzy. And the question was, do we look at that Izzy portion? And my position here is that we do look at the Azul portion, which is very common because Azul is the descriptive term for the Blue Weber Agave plant from which tequila is made. But even if... Blue is being used to mean blue ribbon or blue top notch. Blue is not being used for the color of the plant here. And it's being used to mean that it's blue ribbon, like the number one. I don't agree with that, Your Honor. I think that actually Judge Rosenthal makes the point that Azul is so common because it is a reference to the Blue Weber Agave plant. And indeed, Mr. Lamelli, the founder of Class A Azul, originally wanted to call his product Azul. But when he went to register that as a trademark, the trademark office said, well, you can't have that, someone else has it. And so he said, okay. And he looked at the trademark form and he saw that he had to say what class his trademark was in. And he said, I'll pick class. And he picked Class A Azul. But I would say, even Your Honor, if you thought the district court's finding on whether the mark is suggestive or descriptive was not correct, which is exactly what happened in the Future Brands case, where this court said, I think the district court got it wrong. We think that Brizzi is suggestive, not descriptive. That actually is not at all determinative. Because the real question in the first digit of confusion is not how we categorize the mark on that scale, it's the strength of the mark. This is one element of strength. But this court has said repeatedly that incontestable marks, suggestive marks, can be weak and descriptive marks can be strong. And really what we want to look at is the strength of that Class A Azul mark. And that's where what the district court found is that their bottle is very well known. But many people don't even know the name. Why is that? Why don't people know the name of their product? People know, I want the tequila in the big, tall, white decanter. The reason they don't know the name is that the name is not on the front of the bottle. They put the name hidden on the back of the bottle and on their iconic Reposado product, their most well-known product, it's on a peel-off label. And their founder testified that they want people to be able to peel it off because it doesn't look attractive on the bottle. People collect their bottles, but they peel off the name. In fact, the evidence showed that for more than a decade, long before my clients started selling tequila, their product was being confused with the name Casa Azul. There's legions of testimony, and I can give the court some sights to that, where they acknowledge people regularly get their name wrong because their name is not well known. And what that meant is when people referenced their product and said, oh, I'd like some Casa Azul at my party, and they would say, oh, no, the name is really Casa Azul, but don't worry, it happens all the time. It's a typo or it's a spell-check error. They acknowledged for more than a decade, because their name was hidden, because their name is not well known, because what's well known is their bottle shape, that people were getting their name wrong. And, Your Honor, especially Judge Elred, I think this goes to your question about the Southern Glacier and some of the other evidence of confusion. Those people who are allegedly confused, they didn't come to court, they didn't testify, they weren't deposed. There was a ton of hearsay evidence about that. And I appreciate this court does accept hearsay evidence in this context sometimes, if it shows you the state of mind as opposed to the truth of the matter. But here, where they themselves acknowledge that they've been mistakenly called Casa Azul for a decade, the reason people said, is Casa Azul in that product? Or, I'd like a job with you. I saw that Casa Azul had a job posting. I'm interested in the job. The reason people are confused there is not because my client was causing trademark confusion. It was because they had been inattentive to all of these errors of their own name for a decade. And that is not on us, Your Honor. Respectfully, that's an issue in the Rampart case that I know, Judge Englehart, you were just on, where this court looked at the question of what kind of confusion counts. And specifically said, not all confusion counts. We want to see, is the confusion being caused by something that the defendant has done, or is it something else? And here, I would submit, it is very much something else. Now, my client has been selling, I want to be clear about this, Casa Azul in the alcoholic space for 18 years. Our client has... Let me ask you, you started your remarks describing placement of the product in the stores or liquor departments, and you mentioned price, the price range, and the factor of 3 or 4 or even 5 times as much. Does your client make any product that could be similarly priced to any product of the opposite side? Our highest-end product, our aged Anejo product, Your Honor, is not as expensive as their lowest product. It's not as far. I think maybe it's $20 or $30. Order a magnitude of what? It's about... Our Anejo product is $130, and their Anejo product is $530. They do have a product called their Plata product, their Blanco. These are not competitive products, which is around $140. So those are closer. I actually believe since the trial our client has lowered its prices a bit so that gap has widened. But I would submit that if you're in the market for an Anejo product, you're comparing those two products. Their Blanco product, which is about $140, ours is about $70, and I think it's gone down to $60 now, Your Honor. The reason this matters is when consumers are in the market, and the question is, are you likely to be confused? You're not seeing these products next to each other on the shelf. Theirs is in a very different part of the store. I will say I think the district court misspoke when she said they're not in grocery stores, and another part of her opinion, I think she fixes that and says when they're in the same store, they're in very different places. But consumers are looking for very different things, and they're different consumers. The district court heard evidence on this. She found that our consumers are young and hip. They're looking for something that's all-natural. They're looking for something that's additive-free. Respectfully for the plaintiff, their consumers are ultra-luxury consumers. They're very different. And so the district court was within her discretion, and there's evidence that's plausible in this record to support her findings, that people will not be confused in the context of the way these products look. Again, in the Future Brands case, the look of the products was a very important distinguishing element. In the Rampart case, Your Honor, the word rampart appeared in both of the parties. But one had a castle motif, and the other had a road motif. And so we look at the totality. I think in that case, Your Honor, you wrote that we look at the fonts and the colors and all the differences between the marks. And here are the differences between the products. The difference in the marketing. They don't do any advertising. And, Your Honor, when you asked about pop culture, the district court did actually address pop culture, and I will ask you to take a look at the record where she does that, because she specifically makes the point that even though their product is cited or shown in pop culture, it's usually the bottle and not the name. And that's at page 7437 of the record in the district judge's opinion. There was the one Ozuna song that was played in court. Not my style, but I appreciate that for some people it might be. It was about sex and smoking drugs, and the court said, look, they didn't even pay for that placement. Yes, it referenced the name Klasair Ozul, but most of the pop culture references showed the bottle without the name, and because the name isn't on the front of the bottle, you're not even seeing it there. Can you address the brief of your friend on the other side in light of the question that you and Judge Englehart were discussing? Because the brief says that a variety of Klasair Ozul sells at liquor stores for $129.99. Dollars and 99 cents. And cites the record at 9026 for that, and then says that Klasair Ozul is sold at liquor stores for $135 on a particular product as well. So there is an overlap point, which I think you were trying to distance and saying, oh, well, there's not really, but there is a significant overlap point. Their lowest-end product and our highest-end product are closer. Absolutely. Our Añejo product was, at the time of trial, about $130. Theirs, I thought, was $140. Maybe it's $135. You're selling bottled tequila in liquor stores for similar prices. I disagree, Your Honor. It would be like saying... Is that not true? You are not selling bottled tequila in liquor stores for similar prices. It may be a different quality of tequila. It is bottled tequila in liquor stores at similar prices. The comparison there are two very different tequilas, and I'll explain why. No, but is that... It is true. No, it is true. What I said was true, wasn't it? It is, but I think to call them all tequilas is too broad, because if you're in the market to make cocktails at home, you're going to buy a Blanco tequila. The right comparison, Your Honor, and this is, again, a finding of the district judge. The right comparison is, if you're going to the store to buy a tequila to make cocktails, the Blanco tequila is twice as expensive as theirs. The Añejo, it's almost like a cognac, Your Honor. It's an after-dinner drink. It's a sipping drink. It's extremely rich. It's extremely unctuous. I would submit, you could say there are wines that overlap in price, but you could be in the market for very different wines, and I would say these are not competitive tequilas, but you are correct that at the highest end of our line of tequilas and the lowest end of theirs, they get closer. These are questions of fact for the district court to assess, and when the district court looked at the digits of confusion here, the type of mark, their mark is not strong. They acknowledge, in their testimony, Your Honor, and this is at page 7436 of the record, they acknowledged that some people know the bottle but don't know the name at all. The bottle is a very famous bottle in this field. The name, respectfully, is not known and is not strong. The similarity of the marks takes into account all of the ways in which the marks appear in the market, the trade dress as well as the pricing,  The similarity of the products are different. Assuming, arguendo, that we believe plaintiff's mark is not a descriptive mark and is instead a type of mark that triggers heightened protections, what should we do? You should do... Do we still win based upon the remaining digits without us sending the case back? Absolutely. First of all, we win on that digit, Your Honor, because that digit, I'm going to ask you to look at future brands where this court said, although we disagree with the district court's classification of brizzy as a descriptive mark, suggestive marks are comparatively weak. Even if the district court erred in making the initial classification, its ultimate conclusion that brizzy was weak was not necessarily erroneous. So even on that digit, Your Honor, even if the district court should have said it's a suggestive mark, clase azul is still a weak mark and all of the other digits overwhelmingly support the district court's finding. That there were no clear erroneous findings of fact. That in the sea of similar tequilas, of similar names, with all of the differences, with the defendant's good intent, which they don't even challenge on appeal, that no confusion is likely. We respectfully ask that the court affirm the district court's well-reasoned findings. Can you address this? You've been talking about the bottle quite a bit and that the bottle is so distinctive. The district court concluded that not displaying the mark eroded the mark's recognition at 7-4-3-6 of the record. I'm sorry, Your Honor. I didn't quite hear you. The district court concluded that not displaying the mark eroded the mark's recognition. I'm wondering, you know, by analogy, if Jack Daniels doesn't have a bottle, doesn't have a label on it, you know still it's a Jack Daniels bottle. Because it's an iconic shape, an iconic bottle. Isn't that true of this tequila? The reason it's not true is because the evidence shows people don't know their name. Jack Daniels, you're correct, it's iconic. The Supreme Court had an important case in the trademark field on Jack Daniels recently. The Jack Daniels name itself is very well known. Their own CEO testified, it's true, people don't know the name of our product. They've known this for a decade that people got the name wrong. But they didn't fix it. They didn't say, wow, our name is not well known. We need to do something about that. We need to put it on the bottle so that people know it. We need to do an advertising campaign so that people get to know our name. They reveled in the fact that their bottle, what they said in their testimony is their bottle is one of their most important and iconic assets. That's how their product is known. Their product isn't known by the name. And that came out in the Instagram mistagging, the fleeting mix-up of names that Judge Rosenthal talked about where people were tagging pictures on Instagram of their bottles or of people, this blew me away, Your Honor, painting their fingernails to look like their bottles. And tagging it with what they thought was the name of their product. But they made a fleeting mix-up and tagged it with the Casa Azul name instead of the Casa Azul name. Not because they thought it came from us, because they didn't even know what their name really was. We are not responsible for their failure to be attentive to their own trademark. I'd like to, I know I'm over time, I'd like to take 30 seconds to answer your question about the survey and the timing, Your Honor. At the preliminary injunction hearing, which was about the tequila sodas, we discussed with Judge Rosenthal the fact that we were coming out with a tequila in a bottle as well. We disclosed that to them that prior year. And while we were in discovery in January 2023, we gave them the pictures of the bottle, which are exactly the pictures that we used in our survey. Now it is true, and we told them because this came up in the context of a mediation and the question was can we settle it? And we said, we need to know now because we're bottling this product next week. If we're going to settle, let's settle now. If we're not, here's the bottle. Negotiations are appropriate. No, no, I'm not talking about the negotiations. The key point, this is not a Rule 408 issue, the key point is we gave them the images of the bottle in January 2023. And we did our own survey on the bottles and they could have done it. They did not. They did a survey on the cans comparing them to their bottle. And by the way, Judge Rosenthal heard from their survey expert, Dr. Cunningham. Why should they have to do a survey before the product comes out? Because we had a trial in the case coming up. But normally you would wait to the products there and then do your survey. And that's why we gave it to them. We said, here's the product. We're bottling it now. You can, if you want to do a survey, you can. Now, they didn't raise their concerns about wanting to do a new survey until they saw our rebuttal report on their survey. And they realized their survey had problems. And they came to Judge Rosenthal and said, we'd like to do another survey. And she said, you know what? This case is scheduled for trial soon. We're not going to blow up the schedule. But I'm going to allow, and you've had notice, you've known since January what that product would look like. I'm going to allow your expert to testify about what inferences she would draw from the survey you did on the cans to show whether or not that leads to bottle confusion. And . . . I think we have your position on that. Great. Thank you, Your Honor. And the other side can have an extra minute in their rebuttal because there was extra time taken here. So, six minutes, please. And it shouldn't start yet. Thank you, Your Honor. I'd like to mention one of the last things that you were questioning my friend about concerning knowing the name because of the shape concerning the           John . . . the Jack Daniels bottle. Plaintiff has never shied away from its distinctive bottle, but this . . . this takes the trademark case into the trade dress case. If this was a trade dress case, we would agree that the bottle had a little bit more significance than all the other factors, but the fact of the matter is that we have an incontestable word mark registration for Class A soil, and that was the basis of our claim. We've also shown that this is incredibly well-known through publications. I have here that both the mark and the bottle were shown in the articles featured in New York Times, 12-9-59, and just like defendants featured in  12-9-62. We have two examples in our briefs at page 27 that shows the featuredness of our products together with the bottles, the Class A soil Plata as one, the Class A soil Mezcal, which is not made from Blue Agave Weber, as another factor. We also have several other publications that are provided in the brief at page 26, note 6, where we include other publications such as People Magazine, Cosmopolitan, Vogue, GQ. The writers and editors for the Class A soil name. This all establishes that Class A soil has a strong marketplace recognition. The court erred in its factual finding that it did not. Second, concerning the easy portion that your honor had asked my  about, future proof in that instance verifies that it has to be the basis of the plaintiff's claim in order to use that third-party reference. In that case, the plaintiff was complaining about the terms easy, based off of that was the confusing term that the defendant was using. As a result, the defendant accumulated a ton of third-party use with that easy. When the plaintiff decided to complain to this court, this court said, sorry, your basis of the  was easy, unlike in this case. The  was  about the   claim. Next, we're talking about the my friend was saying that the distinction between a  mark and a suggestive mark is a question of fact. But,  that's actually a question of erroneous law that's being misapplied here. The district court applied the wrong standard. The proper standard under this circuit is whether a mark immediately conveys information regarding quality, characteristic, effect, purpose, or  description    That's future proof and all of its progeny. The defendant defends saying,  as long as it has the capacity to  the information, that's what descriptiveness means, but that's not the case. The district court said that that meant a higher class of tequila. A mark that requires inference is not a  mark. Concerning the third party marks that the  referenced, what do you say even if it requires inference and is not a  mark, they say they still win because it's weak? It cannot be weak for the reasons that I had discussed before. They have a tremendous amount. You've got two components to that. The conceptual strength, which is the descriptive suggestive fanciful marks, and then you have the marketplace recognition. As we discussed, there has been a tremendous amount of  by the public. I would defer the court back to those reasons. How long has the class of solos been around? How many bottles have they sold? How many accounts are they in? Featured by songs, featured in  Even if the evidence is overwhelmingly that the plaintiff's class is a strong mark. Concerning my friend's comment that people don't even know because we don't have our name on the bottle of the product that we're  That's not true. Our founder at trial identified several places on the bottle and on the packaging where you would find class A solo on it. Most notably, it is on the cap of the  It is engraved. Even still, I would defer the court to defendants trial exhibit 5, which is at 10774, which depicts how a consumer would see plaintiff's class A solo in a liquor store. You would see there is an image there that shows various bottles of plaintiff's class A solo in the packaging and without that clearly show class A solo on the front of the  If a consumer is at a liquor store looking to see what type of tequila they want to buy, they clearly see class A solo on the name of the  The last thing I do want to say then, Your Honors, is we believe that this court should find that the defendant's use of class A solo for tequila products does not create a likelihood of confusion with plaintiff's class A  tequila products. We request that this court vacate the  court's  render judgment in favor of plaintiff based on the evidence of record, and that plaintiff has the right to  its expert disclosure and remand for further proceedings. And though we prefer the first, that is our position. Thank you, Your Honors. Thank you. We have your arguments. We appreciate your both arguments in this case today and the cases submitted. Thank you. The next case for today is 2024-20445, Steven Benavides v. Deputy Jay Nunez. We'll hear first from Mr.